UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID J. REISCHAUER #190306,

        Plaintiff,

                                     File No.  2:06-CV-149

v.

                                     HON. ROBERT HOLMES BELL

GILBERT JONES,

        Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff David J. Reischauer filed this *pro se* prisoner civil rights action against Defendant Chaplain Gilbert Russell Jones pursuant to 42 U.S.C. § 1983, complaining that Defendant unfairly burdened his right to exercise his religious beliefs in violation of his rights under the First and Fourteenth Amendments to the United States Constitution, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.* Specifically, Plaintiff complains that while he was in protective segregation at Kinross Correctional Facility, Defendant denied him group worship services, Ramadan fasting, celebration food at the conclusion of Ramadan, and access to religious books.

The parties waived their right to a jury trial.  (Dkt. No. 135, 10/22/08 Order.)  On November 3, 2008, the Court conducted a non-jury trial on Plaintiff's First Amendment

claims and his RLUIPA claims which arose before November 7, 2003.[1]  Only two witnesses testified at the trial:  Plaintiff Reischauer and Defendant Jones.  After careful consideration of the parties' stipulated facts, the witnesses' testimony, the exhibits introduced at trial, and the parties' supplemental briefs, the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

## I.

Plaintiff was incarcerated at the Kinross Correctional Facility ("KCF"), a prison run by the Michigan Department of Corrections ("MDOC"), from June 26, 2003, to January 16, 2004.  (Dkt. No. 133, Jt. Final Pretrial Order, ¶ 2(b).)  Defendant Jones was the chaplain at KCF in 2003-2004.  (*Id.* at ¶ 2(d).)

On October 21, 2003, at Plaintiff's request, Plaintiff was moved from his security level 2 general population housing unit to A-3, the protective segregation unit at KCF.  (*Id.* at ¶ 2(c); Def. Ex. 1, Admin. Seg. Rev.; Def. Ex. 20, History of Cell Usage.)  Plaintiff remained in protective segregation until he was transferred from KCF on January 16, 2004.  (Def. Ex. 1; Def. Ex. 20.)

On August 5, 2003, Plaintiff changed his religious faith group from Protestant to Muslim Brotherhood.  (Def. Ex. 12, Decl. of Religious Pref.)  Between 2001 and 2003 Plaintiff changed his religious preference back and forth between "Protestant" and "Muslim"

---

[1]This Court previously granted summary judgment in favor of Defendant on Plaintiff's RFRA claim and on those portions of his RLUIPA claim which arose after November 7, 2003.  (Dkt. No. 64, Order Approving R&R (Dkt. No. 43).)

five times.  (Ex. 12, Religious Preference Change History.)  While Plaintiff was housed in general population he had no issues with Defendant concerning his access to Muslim religious services, books, or practices.  His issues only arose after he was transferred to protective segregation.

"Protective segregation is a unit which provides physical separation of prisoners from the general population in order to protect them from harm by other prisoners."  (Def. Ex. 3, PD 04.05.120 ¶ H.)  Prisoners in protective segregation are subject to greater limitations on property, program, and activity access than prisoners in general population.  (Def. Ex. 3, PD 04.05.120 ¶¶ W, X, Y.)  Prisoners in protective segregation are not locked in individual cells.  They can move around the housing unit, have visitors, use the telephone, use the mail, and request books from the prison general library or law library.  Writing paper and writing utensils are available to them.

The protective segregation unit at KCF, A-3, has a capacity of only 60 prisoners.  Defendant visited A-3 on a weekly basis.  Plaintiff testified that he never saw Defendant on A-3.  Both Plaintiff and Defendant testified that they never had any oral communications.  All of the communications that form the basis for this action were carried on strictly through written correspondence.

On November 7, 2003, Plaintiff wrote his first letter regarding religious matters while in protective segregation.  This letter was directed to the warden:

> At this time I request that I be provided a copy of the Muslim Brotherhood
> Book Index as I whish to cheak some books out.
>
> I also request I be provided Islamic religious service acording to the teachings
> of Islam as well as both Id selebrations inclooding the Ramadan Fast breaking
> bag as the rest of the Muslims will recive here at KCF.

(Def. Ex. 14, 11/7/03 Reischauer correspondence to KCF Warden (reproduced as written).)

Plaintiff followed up with a similar letter to Defendant dated November 10, 2003:

> At this time I request to be provided a copy of the Muslim Brotherhood Book
> Index as I would like to cheak some books out.
>
> I also request that the Muslims on A-3 be provided religious servies acording
> with the teaching of Islam inclooding both Id festivels and Ramadan fast
> breaking bag as the rest of the Muslims at KCF will recive.

(Def. Ex. 14, 11/10/03 Reischauer correspondence to KCF Chaplain (reproduced as written).)

On November 13, 2003, Defendant responded to Plaintiff's correspondence as follows:

> You have been put on Ramadan meals as of 11/13/03.  There is no such thing
> as "Fast Breaking Bags" for the ID.  All other Muslims purchase their food
> through the prisoner store.  Any books you wish will need to be ordered
> through approved vendors.  Group books do not go to A-3.

(Pl. Ex. D, Pl.'s correspondence.)

## A.  Group Religious Services

Group religious services and activities for prisoners in segregation may be offered

only as set forth in PD 04.05.120 "Segregation Standards."  (Def. Ex. 2, PD 05.03.150 ¶ Y.)

The Segregation Standards provide that a prisoner classified to protective segregation shall

be permitted religious programming, "which shall include group religious services to the

4

extent feasible," and which do not allow contact with general population prisoners. (Def. Ex. 3, PD 04.05.120 ¶ Y(6).)

The procedure for seeking a worship service while in protection at KCF is outlined in KCF Operating Procedure 05.03.150:

> The security of the facility precludes participation in religious programming for prisoners in detention/segregation.  The prisoners housed in detention/segregation may receive religious counseling and/or religious materials by making a request in writing to the institutional Chaplain's office. Prisoners housed in protection, may request a worship service by signing up at the floor officer's desk, three (3) days prior to the normal chapel date for that unit.  The institutional Chaplain will contact the floor officer weekly to discover if any prisoners desire a worship service and confirm the date and time accordingly.

(Pl. Ex. T, OP-KCF 05.03.150 "Information" ¶ 3.)

Plaintiff did not present evidence that he ever signed up for group services at the floor officer's desk.  Neither did he present evidence that any other protective segregation prisoners signed up for Muslim group religious services.  Plaintiff did request that the Muslims on A-3 be provided religious services in his November 10, 2003, correspondence to Defendant.  (Pl. Ex. D.)  However, Plaintiff did not identify anyone else who wanted Muslim group religious services, nor did he indicate how many Muslims on A-3 wished to be provided religious services.

According to Defendant, it was not feasible to provide a group Muslim service based upon Plaintiff's request.  Group services involve the use of limited resources.  The feasibility of group services depended on a number of factors, including time, room, supervision,

number of people attending, and the availability of a volunteer to run the service. According to Defendant, one person does not constitute a group for purposes of group services, and Plaintiff did not demonstrate that there were a sufficient number of other prisoners to justify a group service. Although there was no strict minimum number of participants required for a group service, Defendant testified that for group services to be feasible, he would generally expect a minimum of five prisoners. With any smaller number, individual counseling would be more appropriate.

Defendant also testified that it is difficult to find Muslim clerics or volunteers to come to KCF to lead Muslim services because there are no Muslim congregations or mosques in the Upper Peninsula of Michigan or in the Northern Lower Peninsula of Michigan. Twice a year Muslim volunteers come from the Detroit area to visit all four prisons in the vicinity of KCF. However, because they have limited time, they meet with large groups in general population rather than with individuals in protective segregation.

Plaintiff had alternatives to group services for practicing his religion while in protective segregation. Prisoners, including those in protective segregation, are entitled to visits by a qualified clergy or a volunteer in an outreach program sponsored by an external religious organization, even if these visitors are not on the prisoner's approved visitor's list. (Def. Ex. 4, PD 05.03.140, ¶ N; Def. Ex. 3, PD 04.05.120 ¶ W(13).) Prisoners in protective segregation may correspond with religious clerics through the mail or by telephone. They may engage in individual prayer, and they may possess religious materials and books. In

addition, Defendant testified that prison policy permits a group of three or four prisoners to gather together for sharing.

Plaintiff testified that it was important for him to join with all the Muslim brothers on Fridays for a religious observance.  However, Plaintiff did not present any evidence that Defendant impeded his ability to meet with a small group of other Muslim prisoners on A-3 for religious observances.  Plaintiff acknowledged that he did not attempt to utilize other available means of practicing his religion, such as one-on-one religious counseling through personal visits, mail, or telephone.  Plaintiff did not present any evidence to suggest that Defendant in any way impeded Plaintiff's ability to engage in these alternative methods of practicing his religion.  Plaintiff merely indicated that he did not know anyone to contact who could perform Islamic group services or individual religious counseling because he depended on the Muslim Brotherhood in the prison for his Muslim contacts.

**Ramadan Fasting**

On October 14, 2003, Defendant issued a memorandum regarding Islamic Ramadan Observance.  (Pl. Ex. I.)  The memo was directed to the Control Center and was posted on the bulletin boards in the prison housing units.  During Ramadan it is customary for Muslims to fast from dawn until sunset.  (*Id.*)  The memorandum identified when Ramadan would be observed, and the guidelines for prisoners who wished to participate in the Ramadan fast.  (*Id.*)  To accommodate the Ramadan fast, prisoners must request to be placed on the

Ramadan fast list.  Those who are on the list are allowed to take the evening meal back to their cell in a bag, to be eaten after sunset.

Plaintiff acknowledged that the memorandum regarding Ramadan observance was posted in his housing unit.  The memo indicated that in 2003, Ramadan began on October 26 and ended on November 24.  (Pl. Ex. H, 9/19/03 letter from MDOC Special Activities Coordinator to Wardens.)   Nevertheless, Plaintiff did not request to be placed on the Ramadan fast list until his November 7, 2003, correspondence to the warden.  (Pl. Ex. D; Def. Ex. 14.)

On November 13, 2003, Resident Unit Manager ("RUM") Roger M. Dodds advised Assistant Resident Unit Supervisor ("ARUS") Patrick Harrington that Plaintiff had requested to participate in Ramadan.  (Pl. Ex. F.)

> Prisoner Reischaver [*sic*] has requested to participate in Ramadan.  Please inform 3-11 shift officers to allow Reischaver [*sic*] to pickup his dinner meal when A-3 goes to chow and carry it back to the unit where he can eat it after sunset.

(Pl. Ex. F.) The following day ARUS Harrington emailed RUM Dodds that "Prisoner Reischaver [*sic*] states that he no longer wants to participate in Ramadan now that he is on A-3." (Pl. Ex. G.)  A copy of the email was delivered to Defendant.  (*Id.*)

Plaintiff testified that he never told anyone that we wanted to be removed from the fast list.  Defendant testified that based upon ARUS Harrington's email Defendant understood that Plaintiff had chosen to be removed from the Ramadan fast list.  Defendant explained that it is not uncommon for prisoners to change their minds about fasting.  Plaintiff

has not presented any evidence to suggest that Defendant had any reason to question ARUS

Harrington's representation that Plaintiff had voluntarily withdrawn from the fast list.

The MDOC advised wardens that prisoners who are removed from the Ramadan fast

list must be issued a Notice of Intent to Conduct an Administrative Hearing setting forth an

appropriate reason for removal.  (Pl. Ex. H, 9/19/03 letter from Dave J. Burnett to Wardens.)

Contrary to Plaintiff's assertions, no administrative hearing is required when a prisoner

voluntarily chooses to be removed from the list.

Plaintiff testified that he filed a grievance relating to his removal from the fast list on

November 29, 2003.  In this grievance Plaintiff complained that he was denied "the fast

breaking bag that's provided to the rest of the Muslims at KCF that's payed for out of the

Muslim Brotherhood genral fund." (Def. Ex. 17.)  Plaintiff's grievance appears to be related

to the Eid celebration food rather than the daily fast list.  Even if the grievance can be

understood to reference Plaintiff's removal from the daily fast list, the grievance was not

filed until 15 days after Plaintiff's removal from the list, and after Ramadan had already

ended.

Plaintiff presented two letters he allegedly sent to Defendant dated November 20,

2003, and December 11, 2003.  (Pl. Ex. D, 11/20/03 and 12/11/03 correspondence from

Reischauer to KCF Chaplain).  In the November 20 letter Plaintiff states that he was not

being provided his meal to take back to A-3 to eat after sunset, and advises that he never

asked to be removed from the fast list.  In the December 11 letter Plaintiff asks whether he

9

is still on the Ramadan fast list because he was told by the corrections officers that he was not on the list and could not bring his meal back to his housing unit.  (*Id.*)

Defendant denies receiving either of these letters, and Plaintiff never received a response to these letters.  Plaintiff acknowledged that Defendant had responded to all of his other correspondence.  Because these two letters are not consistent with the contents of Plaintiff's grievance, and because Defendant did not respond to them, as he generally did, the Court finds by a preponderance of the evidence that Plaintiff did not send these letters to Defendant.  The Court accordingly finds that Plaintiff did not request to be reinstated to the Ramadan fast list after he was removed.  In addition, the Court notes that even if Plaintiff did write and send these letters at on the listed dates, the letters still show that Plaintiff did not make a timely complaint about being removed from the daily fast list, and that Plaintiff did not know how long the Ramadan fast lasted.

The Court finds that Plaintiff voluntarily chose to be removed from the Ramadan fast list.  The Court further finds that even if Plaintiff was removed from the list against his wishes, Defendant reasonably understood that Plaintiff had chosen to be removed, and Plaintiff did not make a timely effort to be reinstated to the fast list.

**Eid Ul-Fitr Celebration**

At the conclusion of Ramadan Muslims celebrate the breaking of the fast in a celebration known as Eid Ul-Fitr.  Plaintiff requested that he be provided the same food that

the other Muslim prisoners would receive for the Eid celebration. It was Plaintiff's understanding that the celebration snacks were purchased by the Prisoner Benefit Fund.

Defendant's memorandum regarding Ramadan observances provided that "On the day of breaking the fast (ID AL FITRA), special group prayer will be held in the Kitchen from 8:30-10:30. Snack items from the prisoner store may be consumed during the fast breaking gathering." (Def. Ex. 18, 10/14/03 Memo.) In a second memorandum dated November 23, 2003, Defendant specifically addressed the Ramadan fast-breaking as follows: "Celebration will consist of prayers; speeches; picture taking by Link staff; passing out certificates; and eating snack items purchased out of the prisoner store by participating prisoners." (Def. Ex. 18, 11/23/03 Memo.) Defendant testified that prisoners use their own funds to purchase snacks from the prison store for the Eid celebration. The prison did not supply the snacks, nor were the snacks purchased with Prison Benefit Funds. The prison only supplied a cooler and some ice. Plaintiff was not prevented from ordering his own celebration snacks from the prison store. Plaintiff acknowledged that even indigent prisoners receive $10 a month that could be spent at the prison store.

Because Plaintiff offered no evidence other than his own testimony to contradict the written policy regarding celebration food, the Court finds that the food for the Eid celebration was purchased by prisoners with their own funds, and that accordingly Defendant did not wrongfully refuse to provide Plaintiff a fast-breaking bag for the Eid celebration.

**Muslim Brotherhood Books**

In his correspondence to Defendant dated November 10, 2003, Plaintiff also requested "a copy of the Muslim Brotherhood Book Index" so that he could check some books out. (Pl. Ex. D, 11/10/03 correspondence to KCF chaplain.)

Defendant responded twice to Plaintiff's request for books from the Muslim Brotherhood locker.  In a memo dated November 13, 2003, Defendant advised that "Any books you wish will need to be ordered through approved vendors.  Group books do not go to A-3." (Def. Ex. 14.)  In a second memo dated November 25, 2003, Defendant advised: "As for the books, you can order any book which meets mail policies and is from one of the approved vendors and or publishers." (Pl. Ex. U.)

The MDOC's policy on religious beliefs and practices provides that prisoners are generally allowed to receive religious reading material through the mail or from the institutional chaplain. (Def. Ex. 2, PD 05.03.150 ¶ XX.) "Institutional chaplains shall ensure that religious reading material from a variety of religious groups is available for prisoner use." (*Id.*)  Prisoners in segregation are entitled to access to law library services as well as institutional general library services.  (Def. Ex. 3, PD 04.05.120 ¶ W(15), (16); Def. Ex. 9, PD 05.03.110 (L); Def. Ex. 10, A-3 Protection Rules ¶¶ 22-23.)

Plaintiff contends that because law library clerks bring books requested by protective custody prisoners, Defendant could have brought Plaintiff books from the Muslim Brotherhood library.

Each religious group in the prison has a locker in the control center where it may store property acquired by the group with funds from the Prison Benefit Fund.  The lockers are maintained and controlled by the prisoners.  General population prisoners may check books out of these religious group libraries.  The Muslim Brotherhood maintains a library in one of these religious group lockers.

Defendant testified that he denied Plaintiff's request for books or a book list from the Muslim Brotherhood because the Muslim Brotherhood's book collection was not an institutional library.  The books are not maintained by prison staff, so it is difficult for the prison to ensure that the books are not used for smuggling contraband.  Due to these security concerns, books from such un-monitored sources do not go into A-3, the protective segregation unit.  There is no policy guaranteeing that a prisoner in protective segregation can obtain books from prisoners in general population.

Plaintiff testified that there were no Muslim or Islamic books in the segregation library.  Defendant testified that there was a rotating collection of books in the A-3 religious library, including various books from all of the religions recognized by the State.  (Pl. Ex. 2, Attachment A, Recognized Religious Groups.)  In addition, the books in the general prison library included religious reading material for Muslims.  Plaintiff could have requested books from the prison library.  If the prison library did not have the specific books Plaintiff wanted, Plaintiff could have ordered books from approved vendors.

Plaintiff testified that the books he wanted were not available in the prison library. Plaintiff's testimony is not credible because Plaintiff could not describe the books he wanted by title or subject area, and there is no evidence that Plaintiff ever attempted to request any Muslim religious reading materials from the prison library.

## II.

Plaintiff alleges that Defendant violated his First Amendment and RLUIPA rights by denying repeated requests for Islamic weekly Ju'mam services, denying his repeated requests for religious books from the Muslim Brotherhood Religious Library at KCF, removing him from the monthly Ramadan fast list without his consent, and denying him a fast-breaking bag for the Eid celebration.

Inmates retain their First Amendment right to exercise their religion, but the right may be subjected to reasonable restrictions and limitations. *Abdur-Rahman v. Michigan Dept. of Corrections*, 65 F. 3d 489, 491 (6th Cir. 1995) (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam); *Bell v. Wolfish*, 441 U.S. 520, 549-51 (1979). A prison regulation that impinges on a prisoner's right to exercise his religion is nevertheless valid if it is reasonably related to a legitimate penological interest such as deterrence of crime, rehabilitation of prisoners, and institutional security. *Phelps v. Dunn*, 965 F.2d 93, 98 (6th Cir. 1992) (citing *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987); *Turner v. Safley*, 482 U.S. 78, 89 (1987). Factors relevant to determining the reasonableness of restrictions are: (1) whether there is a "valid, rational connection" between the restriction and the legitimate governmental interest

put forward to justify it; (2) whether there are "alternative means of exercising the right that remain open to the prison inmate; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the existence or absence of ready alternatives of accommodating the prisoner's rights. *Turner*, 482 U.S. at 89-90.

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") prohibits the imposition of a "substantial burden" on a prisoner's religious exercise unless the imposition of the burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a).  The term "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, see 42 U.S.C. § 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005).

While the phrase "substantial burden" is not defined in RLUIPA, courts have concluded that a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits, or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733-34 (6th Cir. 2007) (citations omitted). *See also Cutter*, 544 U.S. at 720 (recognizing that RLUIPA's institutionalized persons

15

provision was intended to alleviate only "exceptional" burdens on religious exercise). A burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise," *Konikov v. Orange County, Florida*, 410 F.3d 1317, 1323 (11th Cir. 2005), or does not "pressure the individual to violate his or her religious beliefs." *Living Water Church of God*, 258 F. App'x at 734.

This Court previously granted Defendant qualified immunity on the RLUIPA claims after November 7, 2003. (Dkt. No. 64, Op. and Order 3.) Thus, the only time period at issue for any RLUIPA claim is the time between October 21, when Plaintiff was placed in protective segregation, to November 7, 2003. Plaintiff has failed to produce any evidence that he requested any books, religious services, or participation in Ramadan fasting from Defendant during the applicable time period. Plaintiff's first written request to Defendant concerning books, services, and participation in fasting is dated November 10, 2003. Because Plaintiff has not produced any evidence that Defendant violated his rights under RLUIPA during the applicable time period, Defendant is entitled to judgment on Plaintiff's RLUIPA claims.

Plaintiff's First Amendment and RLUIPA claims also fail on the merits. "[T]he sincerity of a prisoner's religious beliefs is central to both a First Amendment and a RLUIPA claim." *Horacek v. Burnett*, No. 07-11885, 2008 WL 4427825, at *6 (E.D. Mich. 2008). Accordingly, an initial issue to be considered in addressing a First Amendment Free Exercise claim is whether the Plaintiff's beliefs are religious in nature and whether those religious

beliefs are sincerely held.  *United States v. Seeger*, 380 U.S. 163, 183-84 (1965).  "Whether religious beliefs are sincerely held is a question of fact."  *Mosier v. Maynard*, 937 F.2d 1521, 1526-27(10th Cir. 1991) (citing *Seeger*, 380 U.S. at 185).

The evidence does not preponderate in favor of Plaintiff on the issue of sincerity. Plaintiff changed his religious preference frequently.  He waited half-way through Ramadan before asking to be placed on the fast list.  When he was removed from the fast list the following day, he waited at least six days, if not longer, before complaining that he was improperly removed.  While he complains about Defendant's failure to provide books or services, he did not make any effort to obtain Muslim religious reading from any other available source.  When he was denied group services he did not attempt to obtain individual counseling through visits, mail, or telephone, from any Muslim cleric.  Plaintiff has not met his burden  of showing, by a preponderance of the evidence, that his Muslim faith is sincere. Accordingly, Defendants are entitled to judgment on Plaintiff's First Amendment claims and RLUIPA claims.

In addition, even if Plaintiff's religious beliefs were sincere, Defendant would still be entitled to judgment on Plaintiff's RLUIPA and First Amendment claims because Plaintiff has not shown that Defendant's restrictions on his exercise of religion were not reasonably related to legitimate penological interests, or that they imposed a "substantial burden" on his religious exercise.

17

With respect to Plaintiff's demand for group religious services, this Court previously held that Plaintiff's classification in protective segregation presented a sufficient basis for Defendant to preclude him from attending group religious services with the general population. (Dkt. No.43, R&R 10-11.) With respect to Plaintiff's demand for group services in the protective segregation unit, contrary to Plaintiff's assertions, neither the KCF Operating Procedures nor the KCF A-3 Protection rules suggest that prisoners in protective segregation have a right to group services on demand. (Pl. Ex. T, OP-KCF 05.03.150; Pl. Ex. A, A-3 Protection Rules ¶¶ 42-43.) They merely describe the procedures for requesting or attending religious services. They do not guarantee that group worship services will be provided.

Defendant's failure to provide a group Muslim worship service in the protective segregation unit did not restrict Plaintiff's ability to exercise his religion. The failure to provide a group service did not prevent Plaintiff from worshiping on his own, from worshiping with a small group of other prisoners, or from worshiping with a Muslim cleric or religious volunteer. Moreover, providing group services involves the utilization of limited prison resources. It was reasonable not to provide group religious services where there was no indication that more than one prisoner wanted the service and where there were no Muslim clerics available to lead a group service. Defendant's actions did not impose a substantial burden on Plaintiff's exercise of his religion. To the extent the failure to provide

group services is viewed as a restriction Plaintiff's exercise of his religion, the restriction was reasonably related to the legitimate governmental interest put forward to justify it.

With respect to Plaintiff's claim regarding Ramadan fasting, Plaintiff did not ask to be placed on the fast list until Ramadan was half over, and Defendant was advised that Plaintiff voluntarily took himself off the fast list within a day of being placed on the list. Accordingly, Defendant did not wrongfully interfere with Plaintiff's right to participate in the Ramadan fast.

With respect to Plaintiff's claim regarding the Eid Ul-Fitr feast bag, the evidence reveals that Defendant did not deny Plaintiff anything that other prisoners received.  Any prisoner could purchase food for the Eid celebration from the prison store.  Neither Defendant nor the prison had any responsibility for providing the food for Plaintiff or for any other Muslim prisoner who wanted to participate in the Id celebration.  Defendant's refusal to provide Id celebration snacks accordingly did not interfere with or burden Plaintiff's right to exercise his religion.

Defendant's refusal to bring books from the Muslim Brotherhood to prisoners in protective segregation did not violate any prison regulations.  While in protective segregation Plaintiff had no right to receive books from prisoners in general population, and Plaintiff had ample alternative sources for obtaining Muslim religious books.  Accordingly, the restriction did not impose a substantial burden on Plaintiff's exercise of his religious beliefs and it was reasonably related to a legitimate penological interest in prison security.

19

In summary, the Court concludes that Plaintiff has failed to prevail on either his First Amendment claim or his RLUIPA claim.  A judgment of no cause of action will be entered in favor of Defendant on all of Plaintiff's claims.

### III.

Subsequent to the trial in this matter the Court invited the parties to file supplemental trial briefs.  Plaintiff's supplemental trial brief includes objections, a request for a new trial, and a request for appointment of counsel.  (Dkt. No. 138.)

Plaintiff's first objection is to the Court's failure to resolve his August 28, 2008, request for sanctions against Defendant.  (Dkt. No. 113).  Plaintiff requested sanctions in response to Defendant's proposed final pretrial order because Defendant failed to afford Plaintiff the opportunity to take part in the drafting of the proposed pretrial order.  (*Id.*) Plaintiff was able to file his objections to the proposed final pretrial order, so Plaintiff had input into the final pretrial before it was signed by the Magistrate Judge on October 22, 2008. (Dkt. No. 133.) Plaintiff's request for sanctions is accordingly moot.

Plaintiff second objection is to the Court's failure to resolve his objections to the Magistrate Judge's September 24, 2008, order denying appointment of counsel (Dkt. No. 125, 9/24/08 Order; Dkt. No. 126, Pl.'s Obj.)

A magistrate judge's resolution of a nondispositive pretrial matter should be modified or set aside on appeal only if it is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); W.D. Mich. LCivR 72.3(a).  The Magistrate Judge

denied Plaintiff's request for counsel based upon his determination that the assistance of counsel was not necessary to the proper presentation of Plaintiff's position. (Dkt. No. 125, 9/24/08 Order.)  This determination was neither clearly erroneous nor contrary to law.  The issues in this case were fairly straightforward.   Plaintiff was not challenging the constitutionality of prison regulations, but only Defendant's application of those regulations to Plaintiff's situation.  Accordingly, the issues for trial were predominantly issues of fact rather than issues of law.  Moreover, because this case was to be tried to the court rather than to a jury, many of the difficulties of trying the case were eliminated.

Plaintiff's third objection is to the non-production of Defense witnesses Roger Dodds and Patrick Harrington.  In the final pretrial order Defendant named these individuals as "may call" witnesses.  (Dkt. No. 133 at ¶ 4(B).)  Plaintiff indicated that he declared all of Defendant's listed witnesses to be "hostile witnesses."  (Dkt. No. 133 at ¶ 4(A)(2).)  Plaintiff did not indicate that he was relying on Defendant to call these witnesses.

Plaintiff contends that he was denied an opportunity to examine Harrington and Dodds regarding the content of their emails.  Plaintiff contends that the Court cannot conclude that Harrington and Dodds' statements were true without the benefit of their testimony.

The truth of the content of Harrington and Dodds' emails was immaterial to this trial. Neither Harrington nor Dodds was a defendant in this case.  The issue in this case was what Defendant Jones understood.  Accordingly, Plaintiff's inability to examine Harrington and

Dodds regarding the truth of the statements in their emails did not adversely affect Plaintiff's ability to present his case.

Plaintiff has moved for a new trial and for appointment of counsel.  In support of these requests Plaintiff contends that he did not receive a fair trial because he was not competent to represent himself.

"The appointment of counsel in a civil proceeding is not a constitutional right and is justified only in exceptional circumstances."  *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003) (citing *Lavado v. Keohane*, 992 F.2d 601, 605-06 (6th Cir. 1993).)  In determining whether such exceptional circumstances exist, courts typically consider the type of case, the complexity of the factual and legal issues involved, and the abilities of the plaintiff to represent himself.  *Lavado*, 992 F.2d at 606.  This trial did not present exceptional circumstances warranting the appointment of counsel.   Plaintiff was able to present the documents he wanted to have considered by the court, and he was able to clearly articulate his concerns.  The outcome of this trial would not have been different had Plaintiff had counsel.  Accordingly, the denial of counsel did not result in "'fundamental unfairness impinging on due process rights.'"  *Lavado*, 992 F.2d at 604 (quoting *Reneer v. Sewell*, 975 F.2d 258, 261 (6th Cir. 1992)).

An order and judgment consistent with this opinion will be entered.

Dated: <u>January 29, 2009</u>                     /s/ Robert Holmes Bell
                                                  ROBERT HOLMES BELL
                                                  UNITED STATES DISTRICT JUDGE